Nicole Owens
FEDERAL PUBLIC DEFENDER
Heidi Johnson
Assistant Federal Defender
FEDERAL DEFENDER SERVICES OF IDAHO
702 W. Idaho, Ste. 1000
Boise, Idaho 83702
Telephone:   (208) 331-5500
Facsimile:   (208) 331-5525

Attorneys for Defendant
JASON JOHN CRUMP

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF IDAHO
(HONORABLE DAVID C. NYE)

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | 1:22-cr-00169-DCN |
| | ) | |
| Plaintiff, | ) | **Motion to dismiss the indictment** |
| | ) | **under the Second Amendment** |
| vs. | ) | |
| | ) | |
| JASON JOHN CRUMP, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

# Introduction

Jason Crump stands accused of possessing firearms following a nonviolent conviction on which he received an order of honorable discharge. Under the Supreme Court's landmark decision in *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111 (2022), these charges must be dismissed because prosecuting Mr. Crump for possessing firearms violates his Second Amendment rights.

# Background

The government has charged Jason Crump with two counts of felon in possession of a firearm (18 U.S.C. § 922(g)(1)). (ECF No. 1). Both charges stem from a single predicate felony conviction: a nonviolent 2005 conviction, out of the State of Nevada, for possessing stolen property. *Id.*

The story of Mr. Crump's felony status—and background facts about his post-felony history of possessing firearms—help underscore why dismissal is appropriate here.

***First***, Mr. Crump was convicted of possessing stolen property on August 16, 2005. He then successfully completed his state prison sentence—and his state parole sentence—and, on July 13, 2009, he received an "honorable discharge from parole with restoration of civil rights" (Ex. A).

***Second***, Mr. Crump's history thereafter shows the critical importance of our Second Amendment freedoms. On November 1, 2018, Mr. Crump was assaulted by a man named Lucas McMillen in Baker City, California. Mr. McMillen—a man working the same job site as Mr. Crump was—charged at Mr. Crump while wielding a knife.

"[I]n fear for his life," Mr. Crump shot Mr. McMillen and then promptly called 911 to report the altercation (*see* Ex. B). A grand jury determined that Mr. Crump had acted in self-defense (*see id.*).

Presumably because of his Nevada honorable discharge, no firearms charges were filed against Mr. Crump in connection with this incident. And the incident—again—underscores the wisdom of the Second Amendment: but for the lawful exercise of his Second Amendment rights, Mr. Crump could easily be dead today.

Instead, he is here, charged with two counts of felon in possession of a firearm. Because prosecuting Mr. Crump for this crime violates his Second Amendment rights under *Bruen*, he now moves to dismiss the indictment.

## Argument

The Second Amendment states that "the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II. The amendment codified people's pre-existing right to defend themselves from dangers inherent to living among others. *Bruen*, 142 S. Ct. at 2128, 2135. *Bruen* compels the conclusion that § 922(g)(1) impermissibly infringes upon that right. That is no fluke. After all—as this very case illustrates—"[f]elons may need arms for lawful self-defense just as much as the rest of us do." Eugene Volokh, *Implementing the Right to Keep and Bear Arms for Self-Defense: An Analytical Framework and A Research Agenda*, 56 UCLA L. Rev. 1443, 1499 (2009).

This motion explains why *Bruen* requires dismissal of the Indictment as follows*:* First, *Bruen* laid out a new framework to test any restrictions on one's right

to bear arms. That framework abrogates the Ninth Circuit's means-end test for firearm regulations, *see infra* Section III.A, and assumptions that certain types of regulations are constitutional, *see infra* III.B. Second, *Bruen* shows that § 922(g)(1) presumptively violates the Second Amendment because Mr. Crump's conduct triggers the Amendment's plain text. *Infra* Section III.B. And finally, a detailed review of the historical record shows that the government cannot meet its burden to show that § 922(g)(1) complies with the Nation's tradition of firearm regulation. *Infra* Section III.C. Thus, the indictment must be dismissed.

### A. *Bruen* adopted a new approach to the Second Amendment, overruling contrary Ninth Circuit precedent.

#### a. *Bruen* overhauled the test for determining whether government action infringes on the right to keep and bear arms.

To determine whether government action infringes on the Second Amendment, the Ninth Circuit and other federal courts of appeals have applied a two-step test. *See United States v. Chovan*, 735 F.3d 1127, 1134–37 (9th Cir. 2013) (discussing cases).

Under this two-step test, the first question was "whether the challenged law imposes a burden on conduct falling within the scope of the Second Amendment's guarantee." *Id.* (quotations omitted). This step was satisfied if the law "burden[ed] conduct that was within the scope of the Second Amendment as historically understood." *Id.*

If the law burdened conduct covered by the Second Amendment, courts then "move[d] to the second step of applying an appropriate form of means-end scrutiny." *Id.* The level of scrutiny applied depended on "the nature of the conduct being

regulated and the degree to which the challenged law burdens the right." *Id.* at 1138 (quotations omitted). This could vary between intermediate and strict scrutiny. *See id.* at 1137 (citing *District of Columbia v. Heller*, 554 U.S. 570, 628 n.27 (2008)). So at a minimum, courts always assigned *some* weight to the government's interest in public safety and "keeping firearms away from those most likely to misuse them." *Id.* at 1139 (quotations omitted).

No longer. In the watershed *Bruen* opinion—expressly abrogating prior Ninth Circuit case law—the Supreme Court held that this second step was "one step too many" because only constitutional text and history can justify a firearms regulation. *Id.* at 2127. Now, after *Bruen*, the "standard for applying the Second Amendment" requires courts to do the following:

- If the Second Amendment's "plain text" covers an individual's conduct, courts must presume the Constitution "protects that conduct";

- To rebut this, the government must show that any restriction is "consistent with the Nation's historical tradition of firearm regulation";

- If the government cannot do so, the law is unconstitutional.

*Id.* at 2129–30 (quotations omitted). Accordingly, *Bruen* requires courts to revisit any Second Amendment decision not consistent with this methodology.

### b. *Bruen* also abrogated prior case law relying on "presumptively lawful" exceptions to the Second Amendment.

By the same token, *Bruen* has also abrogated prior case law stating that felon-in-possession statutes are "presumptively lawful" exceptions to the Second Amendment. "[W]here intervening Supreme Court authority is clearly irreconcilable" with prior Ninth Circuit authority, "district courts should consider themselves bound

by the intervening higher authority and reject the prior opinion of this court as having been effectively overruled." *Miller v. Gammie*, 335 F.3d 889, 900 (9th Cir. 2003) (en banc). To determine whether a prior opinion was overruled, courts look not only to "'the holdings of higher courts' decisions'" but also their "'mode of analysis.'" *Id.* (quoting Antonin Scalia, *The Rule of Law as a Law of Rules,* 56 U. Chi. L. Rev. 1175, 1177 (1989)). Such holdings "need not be identical in order to be controlling" so long as they "undercut the theory or reasoning underlying the prior circuit precedent in such a way that the cases are clearly irreconcilable." *Id.* Thus, to the extent *Bruen* employs a different "mode of analysis" than the Ninth Circuit's prior Second Amendment cases, this Court is "bound by" *Bruen*, rather than decisions that are "clearly irreconcilable" with its reasoning. *Id.*

*Bruen* is clearly irreconcilable with prior precedent holding that *Heller*'s list of "presumptively lawful" firearms restrictions automatically controls absent a full historical analysis. *See United States v. Vongxay*, 594 F.3d 1111, 1115 (9th Cir. 2010) (relying on *Heller*'s "presumptively lawful" language to deny a Second Amendment challenge to § 922(g)(1)).

In *Heller*, the Supreme Court confirmed an individual's right to keep and bear arms but cautioned that this right is "not unlimited." 554 U.S. at 626. As an example, the Court provided a non-exhaustive list of "*presumptively* lawful regulatory measures"—i.e., ones that had not yet undergone a full historical analysis. *Id.* at 627 n.26 (emphasis added). This list included laws restricting possession by felons and the mentally ill and the carrying of firearms in "sensitive places." *Id.* at 626. But it

also included "prohibitions on carrying concealed weapons," which "the majority of the 19th-century courts" had held were "lawful under the Second Amendment or state analogues." *Id*. Elsewhere, *Heller* undertook a preliminary historical assessment of concealed-carry laws, pointing to several state Supreme Court decisions holding that the "constitutional guarantee of the right to 'bear' arms did not prohibit the banning of concealed weapons." *Id*. at 613, 629.

But *Heller* emphasized that "we do not undertake an exhaustive historical analysis today of the full scope of the Second Amendment." *Id*. And since this was the Court's "first in-depth examination of the Second Amendment," *Heller* explained that it could not "clarify the entire field." *Id*. at 635. *Heller* promised that there would be "time enough to expound upon the historical justifications for the exceptions we have mentioned if and when those exceptions come before us." *Id*.

Fourteen years later, *Bruen* undertook that "exhaustive historical analysis" of a state licensing regime regulating both open and concealed carrying of firearms. Specifically, New York outlawed open carry and required a showing of "proper cause" before a person could receive a license to "'have and carry concealed' a pistol or revolver." *Bruen*, 142 S. Ct. at 2123 (quoting N.Y. Penal Law § 400.00(2)(f)). *Bruen* acknowledged that *Heller*'s preliminary analysis of concealed-carry laws had deemed them "presumptively lawful." But it accorded that preliminary analysis no weight. Instead, *Bruen* conducted a full historical review and reached a more nuanced understanding of the history surrounding such laws. *See id*. at 2146–47. With this new understanding, it held that New York could not, in fact, issue a blanket

prohibition on concealed carry or even limit it to those with special self-defense needs. *Id*. at 2156.

*Bruen*'s mode of analysis is irreconcilable with case law holding that felon-in-possession laws cannot violate the Second Amendment because they are "presumptively constitutional." That's because *Bruen* shows that *Heller*'s preliminary list of Second Amendment exceptions do not prevent future courts from conducting a full historical review that may point to a different conclusion. So as with the New York statute, the application of *Bruen*'s revamped test—rather than *Heller*'s preliminary take—controls. And this means that *Bruen*'s mode of analysis abrogates prior Ninth Circuit case law, which treated *Heller*'s "presumptively lawful" list as dispositive in the Second Amendment context. *See Vongxay*, 594 F.3d at 1115 (relying on *Heller*'s "presumptively lawful" language to reject a Second Amendment challenge to § 922(g)(1)); *United States v. Phillips*, 827 F.3d 1171, 1174 (9th Cir. 2016) (confirming that *Vongxay* was "[b]ased on this language" from *Heller*). That's the analysis to which this motion now turns.

### B. The Second Amendment's plain text covers Mr. Crump's conduct.

The Second Amendment's plain text covers Mr. Crump's possession of a firearm, meaning that any law purporting to restrict Mr. Crump's firearm possession is presumptively unconstitutional under *Bruen*. Mr. Crump is "part of 'the people' whom the Second Amendment protects." *Bruen*, 142 S. Ct. at 2134 (quoting *Heller*, 554 U.S. at 580). "[T]he people" protected by the Second Amendment "unambiguously refers to all members of the political community, not an unspecified subset." *Heller*,

554 U.S. at 580. Because "felons" are not "categorically excluded from our national community," they fall within the amendment's scope. *Kanter v. Barr*, 919 F.3d 437, 453 (Barrett, J., dissenting); *accord Folajtar v. Att'y Gen. of the U.S.*, 980 F.3d 897, 912 (3d Cir. 2020) (Bibas, J., dissenting).

Additionally, the Second Amendment's plain text protects Mr. Crump's "proposed course of conduct," *Bruen*, 142 S. Ct. at 2134, that is, "to possess and carry weapons in case of confrontation.'" *Id.* at 2135 (quoting *Heller*, 554 U.S. at 592); *contra* 18 U.S.C. § 922(g). Thus, his possession of a firearm for self-defense is "presumptively guarantee[d]," unless the government meets its burden to prove that § 922(g)(1) "is consistent with this Nation's historical tradition of firearm regulation." *Id.* In sum, the Second Amendment 1) applies to Mr. Crump and 2) it protects the precise conduct—firearms possession—for which the government is seeking to imprison him. The charges in this case are accordingly presumptively unconstitutional, and the indictment must be dismissed unless the government can put forward affirmative evidence establishing that this prosecution is consistent with the Nation's historic traditions of firearm regulation.

## C. The government cannot show "an American tradition" that individuals convicted of a felony may not possess a gun.

The government cannot meet its burden to establish the requisite historical tradition. As in *Bruen*, the "general societal problem" that § 922(g)(1) is designed to address—i.e., felons with access to guns—is one "that has persisted since the 18th century." *Id.* at 2131. Thus, § 922(g)(1) is unconstitutional unless the government shows a robust tradition of "distinctly similar historical regulation." *Id.* The

government cannot meet its burden to establish § 922(g)(1)'s historical pedigree for a simple reason: neither the federal government nor a single state barred all people convicted of felonies until the 20th century.[1] *See, e.g.*, Adam Winkler, *Heller's Catch-22*, 56 UCLA L. Rev. 1551, 1563 (2009). The modern version of § 922(g)(1) was adopted *177 years* after the Second Amendment—far too recently to alter its meaning. *Bruen*, 142 S. Ct. at 2154 n.28 ("20th-century evidence" . . . irrelevant to original meaning of Second Amendment).

Section 922(g)(1) very much contradicts earlier evidence from the relevant historical periods: "(1) . . . early modern England; (2) the American Colonies and the early Republic; (3) antebellum America; [and] (4) Reconstruction." *Id.* at 2135–36. Those periods lack evidence of any analogue to § 922(g)(1).

The government will argue that, historically, *some* jurisdictions *sometimes* regulated firearm use by those considered *presently* violent. But that is not a "distinctly similar historical regulation," *Bruen*, 142 S. Ct. at 2131, for at least three reasons. First, not all people with a felony conviction are presently violent. Second, the historical regulations required an individualized assessment of a person's threat to society. And finally, the historical regulations almost always allowed people deemed violent to still possess weapons for self-defense. Thus, even those convicted

---

[1] The first state law to bar the possession of some firearms by felons was enacted in 1914. Catie Carberry, *Felons and Persons with a Mental Impairment*, Second Thoughts: A Blog from the Center for Firearms Law at Duke University (June 27, 2019), https://sites.law.duke.edu/secondthoughts/2019/06/27/miniseries-part-iii-felons-and-persons-with-a-mental-impairment/.

of serious crimes—including rebellion—remained entitled to protect themselves in a dangerous world, with firearms if necessary. Those laws' targeted nature makes them a far cry from declaring that no felon can ever possess "the most popular weapon chosen by Americans for self-defense in the home." *Heller*, 554 U.S. at 629.[2]

### a. Forever depriving all felons of their right to bear arms does not comport with English history.

England, before the Founding, did not ban felons from ever again possessing a firearm. *See Kanter*, 919 F.3d at 457 (Barrett, J., dissenting); C. Kevin Marshall, *Why Can't Martha Stewart Have A Gun?*, 32 Harv. J.L. & Pub. Policy 695, 717 (2009); Joseph G.S. Greenlee, *The Historical Justification for Prohibiting Dangerous Persons from Possessing Arms*, 20 Wyo. L. Rev. 249, 260 (2020). To the extent that England sought to disarm various individuals, those regulations usually required a more culpable mental state and made exceptions for self-defense.

For example, it was a crime under the common law to "go[] armed to terrify the King's subjects." *Bruen*, 142 S. Ct. at 2141 (quoting *Sir John Knight's Case*, 3 Mod. 117, 87 Eng. Rep. 75, 76 (K. B. 1686)). This offense criminalized terroristic conduct, not firearm possession; the arms-bearer had to have "the intent to cause terror in others." *Id*. at 2183 (Breyer, J., dissenting) (describing majority's view). That is a

---

[2] And to the extent that such restrictions create ambiguity, ambiguity is insufficient for the government to meet its burden. *Bruen*, 142 S. Ct. at 2139, 2141 n.11. A single state's statute or a "pair of state-court decisions" cannot outweigh "the overwhelming weight of other evidence." *Id*. at 2153.

much more culpable mental state than § 922(g)(1)'s "knowingly" [possessed]. *See* 18 U.S.C. § 924(a)(8).

Second, when England tried to minimize *prospective* use of firearms by those considered dangerous, it was through sureties, not mass disarmament. Marshall, *supra*, at 717. A justice of the peace could demand that someone for "whom there is probable ground to suspect of future misbehaviour, to stipulate with and to give full assurance to the public, that such offence as is apprehended shall not happen; by finding pledges and securities for keeping the peace, or for their good behaviour." *Id.* (quoting 5 William Blackstone, *Commentaries* *386-87 (St. George Tucker ed., 1803) (1767)). Surety laws did not operate to bar firearms possession; they presumed that a person could have arms. *See Kanter*, 919 F.3d at 457 (Barrett, J., dissenting); Marshall, *supra*, at 716–23; Greenlee, *supra*, at 260. In sum, the regulation targeted a different class (the violent, not the felonious) and used a different enforcement mechanism (sureties, not imprisonment).

Third, to the extent that England tried to disarm whole classes of subjects, it did so on noxious grounds—and still permitted those targeted to keep arms for self-defense. For example, in the age of William and Mary (both Protestants), Catholics were presumed treasonous. Thus, Catholics could keep "Arms, Weapons, Gunpowder, [and] Ammunition," only if they declared allegiance to the crown and renounced key parts of their faith. *See Bruen*, 142 S. Ct. at 2142 n.12 (2022) (quoting 1 Wm. & Mary c. 15, § 4, in 3 Eng. Stat. at Large 399 (1688)); *see also* An Act for the more effectuall preserving the Kings Person and Government by disableing Papists from sitting in

either House of Parlyament, 1 Charles II stat. 2, in 5 Stat. of the Realm at 894–96 (1678). Yet a Catholic could still "keep 'such necessary Weapons as shall be allowed . . . by Order of the Justices of the Peace . . . for the Defence of his House or Person.'" *Bruen*, 142 S. Ct. at 2142 n.12 (omissions in original) (quoting 1 Wm. & Mary c. 15, § 4, in 3 Eng. Stat. at Large 399 (1688)). In other words, even when England assumed that Catholics were engaged in mass treason, they still had "a right to own arms for personal defense." Joyce Lee Malcolm, *To Keep and Bear Arms: The Origins of an Anglo-American Right* 123 (1994).

In short, the English never tried to disarm all felons. Rather, they tried to temporarily limit the use of firearms by those individuals found to be violent and rebellious. And even those individuals could keep arms for self-defense.

### b. Forever depriving all people convicted of a felony of their right to bear arms does not comport with colonial and Founding-era history.

"[T]here is little evidence of an early American practice of," *Bruen*, 142 S. Ct. at 2142, forever barring all people convicted of a felony from ever again possessing a firearm. That is not surprising; the new Nation had a more permissive approach to firearm regulation than England. *See, e.g.*, William Rawle, *A View of the Constitution of the United States of America* 126 (2d ed. 1829). The early United States accepted that those who committed crimes—even serious ones—retained a right to defend themselves. That can be seen in the colonies' and states' statutes, early American practice, and rejected proposals from state constitutional conventions.

Motion to dismiss indictment—Second Amendment

### 1. Founding-era statutes and regulations

First, no Founding-era statutes or interpretations of the common law barred all felons from possessing firearms. *Kanter*, 919 F.3d at 454 (Barrett, J., dissenting); *Folajtar*, 980 F.3d at 915 (Bibas, J., dissenting); *United States v. Cheste*r, 628 F.3d 673, 679 (4th Cir. 2010); *Binderup v. Att'y Gen. of the U.S.*, 836 F.3d 336, 368 (3d Cir. 2016) (en banc) (Hardiman, J., concurring).

To the extent that the new Nation sought to disarm classes of people, the regulatory approach was a far cry from § 922(g)(1). For example, the Virginia colony, like England, disarmed Catholics, still viewed as traitors to the crown, who would not "swear an oath abjuring the ecclesiastical authority of the Pope." Robert H. Churchill, *Gun Regulation, the Police Power, and the Right to Keep Arms in Early America: The Legal Context of the Second Amendment*, 25 Law & Hist. Rev. 139, 157 (2007) (citation omitted). But there was an exception for weapons allowed by a justice of the peace "for the defense of his house and person." *Id.* By the same token, following the Declaration of Independence, Pennsylvania ordered that those who did not pledge allegiance to the Commonwealth and renounce British authority be disarmed. *Id.* at 159. These examples embody a regulatory approach not of class-based disarmament, but of disarmament only after a specific finding that a specific person posed a risk of violence to the state.

Colonial and Founding-era practice also suggests that committing a serious crime did not result in a permanent disarmament. For example, leaders of the seminal Massachusetts Bay colony once disarmed supporters of a banished

seditionist. Greenlee, *supra*, at 263 (citations omitted). Nevertheless, "[s]ome supporters who confessed their sins were welcomed back into the community and able to retain their arms." *Id.* And in 1787, after the participants in Shay's Rebellion attacked courthouses, a federal arsenal, and the Massachusetts militia, they were barred from bearing arms, *for three years. Id.* at 268–67. In fact, Massachusetts law required the Commonwealth to hold *and then return* the rebels' arms after that period. Sec'y of the Commonwealth, *Acts and Resolves of Massachusetts 1786–87*, at 178 (1893). In other words, one of the first states punished people involved in one of the most serious violent crimes—armed rebellion—with merely a three-year firearm ban and promise to later return the weapons used to attack the new government.

### 2.  Proposals from state constitutional conventions

Academics and jurists agree that if one seeks even debatable "authority before World War I for disabling felons from keeping firearms, . . . one is reduced to three proposals emerging from the ratification of the Constitution." *Kanter*, 919 F.3d at 454 (Barrett, J. dissenting) (quoting Marshall, *supra*, at 712). These proposals, if relevant at all, do not demonstrate a historical tradition of regulation akin to § 922(g). *See, e.g.*, *Kanter*, 919 F.3d at 454 (Barrett, J. dissenting); *United States v. Skoien*, 614 F.3d 638, 648 (7th Cir. 2010) (en banc) (Sykes, J., dissenting); Marshall, *supra*, at 713; Greenlee, *supra*, at 267; Carlton F.W. Larson, *Four Exceptions in Search of a Theory: District of Columbia v. Heller and Judicial Ipse Dixit*, 60 Hastings L.J. 1371, 1375 (2009).

As the states' conventions debated ratification, several proposed that the Nation's charter guarantee the right to bear Arms. *Id.*; Greenlee, *supra*, at 265–66; 1 Jonathan Elliott, *The Debates in the Several State Conventions of the Federal Constitution* 328, 335 (2d ed. 1836). Three such proposals included an arguable limitation on that right. First, New Hampshire's convention proposed that citizens not be disarmed "unless such as are or have been in actual rebellion." 1 Elliot, *supra*, at 326. Second, Samuel Adams argued at Massachusetts' convention that "the people of the United States, who are peaceable citizens," should not be deprived of their arms. *Kanter*, 919 F.3d at 454–55 (Barrett, J., dissenting) (quoting 2 Bernard Schwartz, *The Bill of Rights: A Documentary History* 675, 681 (1971)). Finally, a minority of Pennsylvania delegates—all Antifederalists who opposed ratification[3]— suggested that persons should not be disarmed "unless for crimes committed, or real danger of public injury from individuals." *Id.* at 455 (quoting Schwartz, *supra*, at 662, 665). "[O]nly New Hampshire's proposal—the least restrictive of the three—even carried a majority of its convention." *Id.*

These proposals are an exceptionally weak form of historical evidence. None made it into the final text, and as *Heller* warns, "[i]t is always perilous to derive the meaning of an adopted provision from another provision deleted in the drafting process." *Heller*, 554 U.S. at 590; *see also Chevron U.S.A. Inc. v. Echazabal*, 536 U.S.

---

[3] As *Heller* noted, it is "highly problematic" to assume that the "the best or most representative reading of" the Second Amendment "would conform to the understanding and concerns of the Antifederalists." *Id.* at 590 n.12.

73, 81 (2002) (explaining *expressio unius est exclusio alterius*). Furthermore, *Heller* specifically admonished that "the drafting history of the Second Amendment—the various proposals in the state conventions and the debates in Congress"—is a "dubious" source for Second Amendment interpretation. *Heller*, 554 U.S. at 604.

Indeed, properly understood, these proposals actually *bolster* the conclusion that felon-in-possession laws are inconsistent with the Nation's historic traditions of firearm regulation. That's because the proposals were available for consideration, yet they did not make it into the Constitution. Instead, the Constitution embodies an unqualified Second Amendment right.

In any event, even if one assumes that the proposed limitations shed light on the actual Second Amendment's meaning—and suggest that it is more restricted than its text suggests—they go no distance toward legitimizing § 922(g)(1). The proposals propose some restrictions on arms for those who engaged in rebellion or violence. Section 922(g)(1), by contrast, bars firearm possession for anyone convicted of a crime punishable by more than a year. Those are not close to analogous. *See* Marshall, *supra*, at 713 (concluding that "these three formulations do not support a lifetime ban on any 'felon' possessing any arms"); Greenlee, *supra*, at 267 (same); Larson, *supra*, at 1375 (same); *Kanter*, 919 F.3d at 455 (Barrett, J., dissenting) (same); *Folajtar*, 980 F.3d at 915 (3d Cir. 2020) (Bibas, J., dissenting) (same); *Skoien*, 614 F.3d at 648 (Sykes, J., dissenting) (same).

/ / /

/ / /

### c. Forever depriving all felons of their right to bear arms does not comport with 19th-century history.

American practice and laws during the Nineteenth Century—before and after the Civil War—also confirms that § 922(g)(1) does not comport with the "Nation's historical tradition of firearm regulation." *Bruen*, 142 S. Ct. at 2135. The United States continued to regulate—but not ban—firearm possession by those feared to be violent. *See Bruen*, 142 U.S. at 2148 (holding that 19th century surety laws allowed people likely to breach the peace to still keep guns for self-defense or if they posted a bond). But, as discussed above, that is not similar to § 922(g)(1). There is no evidence of a precursor to § 922(g)(1)'s broad, class-based ban. In fact, there are at least two documented instances where attempts to disarm a class of offenders was rejected as inconsistent with the right to bear arms.

First, as with Shay's Rebellion, Congress declined to disarm southerners who fought against the Union in the Civil War. *Whether the Second Amendment Secures an Individual Right*, 28 Op. O.L.C. 126, 226 (2004). The reason: some northern and Republican senators feared that doing so "would violate the Second Amendment." *Id.*

Second, when a Texas law ordered that people convicted of unlawfully using a pistol be disarmed, it was struck down as unconstitutional. *Jennings v. State*, 5 Tex. Ct. App. 298, 298 (1878). The Texas Court of Appeals—then the state's highest court for criminal cases—held:

> The Legislature has the power by law to regulate the wearing of arms, with a view to prevent crime, *but it has not the power to enact a law the violation of which will work a forfeiture of defendant's arms*. While it has the power to regulate the wearing of arms, it has not the power by legislation to take a citizen's arms away from him. *One of his most sacred*

*rights is that of having arms for his own defence and that of the State.* This right is one of the surest safeguards of liberty and self-preservation.

*Id.* at 300–01 (emphases added).

Although *Jennings* interpreted Texas's constitution, not the Second Amendment, its analysis is indicative of how firmly states believed that everyone had a fundamental, preexisting right to own firearms for self-defense—even those who had misused firearms in the past. *Jennings'* setting is notable. As *Bruen* noted, 1870s Texas otherwise imposed unusually strict firearms regulations. 142 S. Ct. at 2153.

In sum, the 19th century history provides clear evidence that mass disarmament for people convicted of an offense is unconstitutional. Not only was there a consistent practice of allowing people who broke the law to keep weapons for self-defense—at least one state appellate court and Congress agreed that disarming lawbreakers was unconstitutional. As *Bruen* teaches: "[I]f some jurisdictions actually attempted to enact analogous regulations during this timeframe, but those proposals were rejected on constitutional grounds, that rejection surely would provide some probative evidence of unconstitutionality." 142 S. Ct. at 2131.

**D. The American historical tradition is inconsistent with criminalizing gun possession by individuals who have been honorably discharged from parole and whose civil rights have been ordered restored.**

Finally—if nothing else—the government cannot possibly establish that the Second Amendment countenances prohibitions on the possession of firearms by individuals who have been honorably discharged from parole and whose civil rights have been ordered restored. To the contrary, in early America "once wrongdoers had

paid their debt to society," then society "forgave them and welcomed them back into the fold." *Foltjar*, 980 F.3d at 923 (Bibas, J., dissenting).

This was particularly so when the government took actions that affirmatively restored individuals' rights. In *Carver v. Jackson ex dem. Astor*, for example, the Supreme Court ruled that where the government takes an action that "restor[es] [individuals] to civil existence," they are also thereby restored to all rights normally forfeited by virtue of a criminal conviction. 29 U.S. 1, 33 (1830) (discussing an individual who had initially been banished before having his civil rights restored by the banishment's repeal).

The fact that Mr. Crump received an honorable discharge from parole and restoration of civil rights order places him in an analogous position to early Americans who were deemed to have paid their debt to society or who were "restored . . . to civil existence." *Id.* These individuals retained their rights to keep and bear arms. So too, by analogy, does Mr. Crump.

## Conclusion

Charging Mr. Crump with felon in possession of a firearm is unconstitutional; the indictment must be dismissed.

Motion to dismiss indictment—Second
Amendment

Dated: September 12, 2022   NICOLE OWENS
            FEDERAL PUBLIC DEFENDER
            By:

            <u>/s/ Heidi Johnson</u>
            Heidi Johnson
            Assistant Federal Defender
            Federal Defender Services of Idaho
            Attorneys for Defendant
            JASON JOHN CRUMP

CERTIFICATE OF SERVICE

I CERTIFY that I am an employee of the Federal Defender Services of Idaho, and that a copy of the foregoing document was served on all parties named below on this 26th day of September, 2022.

Francis Zebari, Assistant United States Attorney
Office of the United States Attorney   ____United States Mail
1290 West Myrtle Street, Suite 500   ____Hand Delivery
Boise, ID 83702        ____Facsimile Transmission
(208) 334-1211        _X_ CM/ECF Filing
(208) 334-1413 – Facsimile    ____Email Transmission
Frank.Zebari@usdoj.gov


Dated: September 26, 2022  /s/ Thad Blank_____
           Thad Blank